```
3042559353                                                                    1 / 1
CASE 17-C-777         RALEIGH                        PAGE 0001

JONATHAN BARBER              VS. ICG BECKLEY, LLC


LINE  DATE     ACTION

  1  12/26/17  CASE FILED - ISSUED SUMMONS ALONG W/ COMPLAINT, RETN TO ATTNY
  2            FOR SERV.    DP                                      (CC)
```

EXHIBIT # A

IN THE CIRCUIT COURT OF RALEIGH COUNTY, WEST VIRGINIA

JONATHAN BARBER, individually, and
BETHANY BARBER, his wife, and as Parents,
Guardians and Next Friends of their minor son, L.B.,

    Plaintiffs,

v.

CIVIL ACTION NO. 17-C-_977-D_

ICG BECKLEY, LLC.,
a Limited Liability Company, and
ARCH COAL, INC.,
a foreign Corporation,

    Defendants.

RALEIGH COUNTY
RECEIVED AND FILED

DEC 2 6 2017

PAUL H FLANAGAN
CIRCUIT CLERK

## COMPLAINT

Plaintiffs, Jonathan Barber and his wife, Bethany Barber, as the parents, guardians and next friends of their minor son, L.B., by counsel, state and allege as follows for their Complaint against the defendants:

### PARTIES & JURISDICTION

1. At all times relevant, plaintiffs were residents and citizens of Raleigh County, West Virginia. On and prior to April 21, 2017, plaintiff Jonathan Barber was employed by defendant ICG Beckley, LLC as a continuous mining machine operator.

2. Defendant ICG Beckley, LLC ("ICG Beckley") is a limited liability company, whose sole business involves the extraction and processing of coal in Raleigh County, West Virginia. According to information on the Mine Safety and Health Administration's (MSHA) Mine Data Retrieval System (MDRS) database, ICG Beckley's sole business consists of operating underground coal mines and processing plants exclusively in the State of West Virginia, and exclusively in Raleigh County (See MSHA MDRS printout attached hereto as "Exhibit A"). In fact, the only mine operated by ICG Beckley is the Beckley Pocahontas

underground mine, operating under MSHA ID No. 46-05252. Defendant ICG Beckley's sole business operations are contained in the State of West Virginia. An unincorporated association, including an LLC, is a citizen of the state where it has its principal place of business and the state under whose laws it is organized. *KJBJ, LLC v. EnerVest Operating, LLC*, 2016 U.S. Dist. LEXIS 82949, *5, citing 28 U.S.C. § 1332(d)(10). An organization's principal place of business is its "nerve center," which is ordinarily the organization's headquarters. *Id.*, citing *Hertz Corp. v. Friend*, 559 U.S. 77, 80-81, 130 S. Ct. 1181, 175 L. Ed. 2d 1029 (2010). While ICG Beckley lists the President/CEO and Sr. Vice President of Arch Coal, Inc., as the managing members of the unincorporated association, the location of direction, control, and coordination of the subsidiary ICG Beckley occurs in the State of West Virginia. As such, defendant ICG Beckley's nerve center and day to day operations are controlled in and from offices in Beckley, Raleigh County, West Virginia, making it for diversity purposes, a citizen and resident of the State of West Virginia. Defendant ICG Beckley is, and at all times relevant herein was, regulated by the United States Department of Labor Mine Safety and Health Administration ("MSHA") as well as the West Virginia Office of Miners' Heath Safety & Training ("WVOMHST") and was responsible for compliance with all applicable MSHA and WVOMHST rules and regulations, as well as commonly accepted safe mining practices used in the coal industry, in the operation of the Beckley Pocahontas mine.

3. Defendant Arch Coal, Inc., ("Arch") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Arch conducts business in Raleigh County, West Virginia through its provision of oversight and control over mine planning, engineering, budgeting and safety at the Beckley Pocahontas mine. Upon information and belief, Arch provided and oversaw safety, engineering, regulatory compliance and other support services to

the Beckley Pocahontas mine which employed plaintiff Jonathan Barber. Defendant Arch had and assumed a duty to ensure that the Beckley Pocahontas mine in which plaintiff, Jonathan Barber, was employed was operated in a reasonably safe and prudent manner and in conformity with applicable MSHA and state mining laws and regulations.

4. Jurisdiction and venue are appropriate in this Court pursuant to W. Va. Code §56-1-1(a)(2):

    a. Defendant ICG Beckley is a West Virginia entity, with its nerve center and only operations located in West Virginia;

    b. Defendant Arch is a foreign corporation that transacts and conducts business in Raleigh County, West Virginia;

    c. Defendants Arch's principal offices are located outside West Virginia; and,

    d. Defendants Arch's president and chief officers reside outside West Virginia.

## FACTS

5. The Beckley Pocahontas underground mine is located in an area comprised of multiple geologic anomalies, due in large part to the soft nature of the Pocahontas No. 3 coal seam, coupled with the depth of cover, mine height and areas of over and/or undermining in the vicinity of the Beckley Pocahontas mine, including the Beckley seam 300 feet above and the Sewell Seam 575 feet above the Pocahontas No. 3 seam, which have resulted in a long history of adverse rib conditions in the mine. Because of the adverse nature of the mine ribs which would spall, slough and fall out shortly after taking weight, the mine implemented a practice whereby permanent rib supports were installed on-cycle as the mine roof was being supported immediately following the area being mined.

6. Long prior to April 21, 2017, the common practice at the mine was to overdrive a projected face, which is to advance the entry some 5-8 feet deep into the pillar in line with the projected entry in accordance with the mining plan. In so doing, there is no need to install any rib support in the entry face, as it is advanced inby the area where men are expected to work and travel, thereby protecting them from any unintended fall of the mine face. Overdriving was done to prevent employees from being exposed to a projected face which was just a flush rib without any support installed to hold the rib This practice also comported with longstanding mine safety practices and requirements whereby persons are not allowed to work or travel inby the next to last row of permanent roof support.

7. Sometime prior to April 21, 2017, mine management instructed the continuous mining machine operators to stop the practice of overdriving projected face areas due to the need to ventilate the pocket created once the face would be overdriven. As a result, the projected faces were left flush with the mine ribs. However, despite the adverse nature of the mine ribs on the No. 3 section of the mine, nothing was done to support or otherwise control the area of the projected face which was just in essence the same as a rib until the miner began advancing the face. Due to the high degree of risk of serious injury or death this presented, employees, including some who work in a supervisory position when needed, made specific complaints about this unsafe practice. Despite these complaints, the practice continued.

8. In the weeks prior to April 21, 2017, the defendants made the decision to start mining two seams of coal simultaneously on the No. 3 section; the Pocahontas No. 3 seam and the Beckley seam. These two seams of coal were separated by a "middle-man" or a layer of rock, that measured anywhere from 3 inches to 3 feet across the section. The presence of these geologic conditions coupled with this increased height mine plan led to adverse rib conditions

routinely existing on the No. 3 section, even when permanent rib support was installed as evidenced by pre-shift and onshift inspections conducted in the days and weeks prior to April 21, 2017 routinely note the presence of adverse rib conditions.

9. The decision to mine both seams simultaneously resulted in an increase in mine height from around 6 feet to around 11 feet or more. This increase required larger equipment in the form of larger continuous mining machines, larger roof bolting machines, and larger shuttle cars. At the time the decision to commence dual seam mining was made, the mine was utilizing Joy 14CM15 continuous mining machines which have a maximum cutting height of approximately 10 feet. Because of the limited maximum cutting height, upon information and belief, management had discussed the need for and ordered larger equipment, including but not limited to Joy 12 series continuous mining machines with a maximum cutting height of 12-16 feet depending on model.

10. For at least ten days prior to April 21, 2017, management directed the crew on the No. 3 section to commence dual seam mining despite only having the existing Joy 14CM15 continuous miners available for use at the mine, rather than wait for the larger continuous mining machines to arrive which could more safely and adequately mine the coal seams at this planned increased height. As a result, when the continuous mining machine was used at the peak of its maximum mining height, due to the arc of the cutter head as it articulates up and down the mine face, a curvature occurred which would sometimes leave an area of coal in the form of a brow bound between the mine roof and face which presents as an adverse condition, especially given the nature of the two coal seams, with the softer Pocahontas No. 3 seam situated at the base of the rib and projected face area which was left flush and unsupported.

11. On or about April 20, 2017, the area of the No. 2 projected face was mined in accordance with the procedure described herein above. This practice coupled with the prevailing geologic conditions on the section created a brow situated atop the projected No. 2 face. As the evening shift on April 20, 2017 neared completion, the continuous mining machine operator noticed the unsafe brow and directly pointed it out to his supervisor and foreman. Rather than correct this specific unsafe working condition, the foreman advised the continuous mining machine operator that it was too close to the end of the shift, that someone else could take care of the brow, and the crew ended its shift and left the section. Despite this specific complaint, the section foreman failed to record or correct this unsafe condition, leaving it to exist as the following shift, a non-production crew, would commence work.

12. On the morning of April 21, 2017, plaintiff arrived to work as a continuous mining machine operator on the day shift. This was the next production shift after the evening shift wherein the mining machine operator working on the same side of the same section where the plaintiff was instructed to work had observed and pointed out to his foreman the existence of the unsafe brow which was still unrecorded and not supported or otherwise controlled to protect persons from hazards related to falls of the roof, face or ribs in this area.

13. The area where the plaintiff was instructed to perform his assigned duties as a continuous mining machine operator must be adequately and competently inspected and assessed for hazards no more than 3 hours prior to commencement of the working shift and at least every 2 hours thereafter, as required by state and federal mine safety rules and regulations. All hazardous conditions must be recorded and/or corrected prior to allowing men to work or travel in an area, specifically including but not limited to ensuring that the roof, face and ribs of areas where persons work or travel shall be supported or otherwise controlled to protect persons from

hazards related to falls of the roof, face or ribs and coal or rock bursts. Despite these requirements as set forth in state and federal mine safety rules and regulations, the hazardous brow situated atop the proposed No. 2 face on the No. 3 sections was not supported or otherwise controlled prior to plaintiff entering this area to work. In fact, even though the unsafe nature of the ribs in this specific area of the mine where dual seam mining was being performed were so adverse that that required permanent support be installed at two levels on cycle as mining advanced, nothing was done to support or otherwise control the rib which was to be the No. 2 face.

14. Plaintiff commenced his assigned duties and the mine ventilation curtain was hung in an area outby the proposed No. 2 face to direct the flow of air and the plaintiff was instructed to commence taking the 2 left crosscut, where the No. 2 proposed face would be on his right side. No reflectors were hung from the permanent roof support in the in No. 2 intersection alerting or warning the plaintiff to stay outby the next to last permanent roof support in the area of the No. 2 proposed face which was not overdriven and was flush with the mine rib.

15. Despite the plan in effect on April 21, 2017, not requiring rib bolting in projected intersections, both state and federal mine safety rules and regulations require that the roof, face and ribs of areas where persons work or travel shall be supported or otherwise controlled to protect persons from hazards related to falls of the roof, face or ribs and coal or rock bursts, which defendants failed to do. Even in the absence of rib bolting in a proposed intersection, overdriving the area or hanging a warning or reflector to protect employees from working near the unsupported proposed face could have prevented plaintiff's injuries. Nonetheless, the defendants made a conscious decision not to do anything to support, protect or control these

areas to which miners such as the plaintiff would be exposed, including the rib which was the proposed No. 2 face which presented with a brow.

16. As the plaintiff attempted to take his first cuts from the 2 left crosscut, the continuous mining machine began to malfunction. Plaintiff contacted the maintenance/electricians who came to the area and had him back the continuous mining machine out of the cut so it could be examined to determine the problem. As the electricians examined the machine and had the plaintiff operate various controls to determine the nature of the problem, the loose, unstable brow situated atop the rib that was to be the proposed No. 2 face popped and fell from a height of over 10 feet, striking the plaintiff between his shoulder blades and crushing him to the ground. The brow consisted of 2 ½ inches of rock along the top of coal measuring 54 inches long, 36 inches wide and 20 inches thick.

17. The plaintiff gasped for help and stated to the electricians that he was unable to breathe. Due to the size and weight of the brow which crushed him and had him pinned to the mine floor, the electricians had to summon help to have multiple people lift the rock from him. The plaintiff was unable to feel his arms or legs and suffered spinal cord trauma which rendered him a quadriplegic.

18. MSHA conducted an investigation into the events giving rise to this cause of action and determined that defendant ICG Beckley was in violation of 30 C.F.R. §75.202(a), issuing citation No. 9115351, which reads:

> The mine operator has failed to control or support a rib where persons are required to work or travel. A rib failed in the No. 2 face, one break inby survey station 19501 on the 005-0 MMU. A serious injury has resulted from this rib failure to a continuous miner operator, while operating the continuous mining machine. The collapsed rib consisted of 2 ½ inches of rock along the top of coal measuring 54 inches long, 36 inches wide and 20 inches thick.

Standard 75.202(a) was cited 34 times in two years at mine 4605252.

19. The inspector's hand written notes stated that the brow which collapsed and crushed the plaintiff was created by the angle the cutter head made in the face at 10 feet high, and that the mine examiner should have observed the condition. This is the same brow that plaintiff's co-worker had reported as being unsafe to his foreman less than 12 hours prior to plaintiff's injury.

20. In the days immediately following the events giving rise to this cause of action, defendants devised and submitted an addendum to the approved roof control plan entitled "Safety Precautions for Dual Seam Mining," none of which were implemented or adhered to on April 21, 2017, despite being well-known and long-standing safety practices followed in underground mining. These safety precautions require:

> Prior to starting a new crosscut, the adjacent heading will be advanced in such a manner that at least 2 rows of permanent roof support and 1 row of permanent rib support can be installed inby the projected intersection. This heading shall not be overdriven more than 10 feet.
>
> When mining, the CM operator shall not stand past the last row of permanent rib support. Some type of sign or reflector with a flashing light shall be hung in line with the last row of rib support to prevent a miner from traveling along the rib line inby the last row of permanent rib support.
>
> If a punch through creates a flush heading, the area shall be dangered off until the area can be mined or rib bolted.
>
> Miners shall not travel inby the 2nd to last row of permanent roof support.
>
> All miners involved in the dual seam mining will be trained on the rib conditions and hazards. This training will be recorded on a 5023 form.

21. Plaintiff was transported to CAMC General Hospital where he was required to undergo emergency surgery to stabilize his spine and was diagnosed as an American Spinal Injury Association (ASIA) grade A complete C6 quadriplegic. After spending one week at CAMC, plaintiff was flown to Shepherd Rehabilitation Center in Atlanta, Georgia, where he lived for the next six months to undergo extensive rehabilitation and therapy to learn to adjust to his permanent limitations and paralysis, as he will now at the age of 29 be forced to spend the remainder of his life confined to a wheelchair.

22. While being confined to Shepherd Center, plaintiff was forced to live out of state away from family and friends for some 6 months, missing his only son's first words and first steps as he endured extreme physical and emotional anguish and suffering throughout his therapy. This suffering was only further exacerbated as plaintiff was denied not only required items, but common human decency by defendant's agent and workers compensation carrier, including but not limited to the following acts and omissions which caused plaintiffs great physical and emotional damage:

> No vehicle has been provided or modified despite numerous requests, requiring plaintiff to be transported via ambulance to medical appointments and otherwise confined to his home;
>
> Plaintiff was granted authorization for a feeding fork, but denied a feeding spoon;
>
> Upon returning to West Virginia from Atlanta, plaintiff was stranded at Yeager airport, left there alone which required his attorney to contact and personally hire an ambulance to transport him to his home after he was abandoned;
>
> Supplies for his bowel and bladder management needs were not sent to his home upon his return to West Virginia for several days, requiring him to sit confined to his bed because he was not provided a suitable number of catheters;

Despite numerous requests, he has been refused a power wheelchair;

Despite prior requests, upon returning home, plaintiff has still not been provided with an in-home nurse to assist in his care and management;

When home renovations were requested to make his home handicap accessible, including a ramp and bathroom renovations, plaintiffs were told it could take several months;

Plaintiff was sent home without a suitable shower chair, requiring him to be hosed off in the garage as his only form of bathing;

Because of issues with pressure sores and wound management, plaintiff's doctor requested authorization for a Stryker or Hill-Rom hospital bed. However, defendant's agent and carrier only approved a smaller, less expensive bed which is a short-term hospital bed, as opposed to a long-term bed;

While in Atlanta, plaintiff's around the clock nurse informed him she would not be staying with him during the September 2017 hurricane, as she had child care issues. Plaintiff's counsel contacted defendant's agent and workers compensation carrier to obtain a replacement nurse, but plaintiff was abandoned, leaving no one there to manage his bowel and bladder program, causing him to go into autonomic dysreflexia and causing him reflex sympathetic discharge due to over distended bladder;

Once the plaintiff had been off work for six months, plaintiffs were informed that their health care coverage for plaintiffs and their infant son once provided by defendants would now be terminated unless they were able to pay a premium of approximately $450 a month.

23. As a direct and proximate result of defendants' acts and/or omissions which caused plaintiff Jonathan Barber to sustain multiple crush injuries ultimately rendering him an ASIA A complete C6 quadriplegic, paralyzed from the chest down and confined to a wheelchair for the remainder of his young life, defendants are liable to the plaintiff for all damages, including but not limited to:

a. extreme physical pain and suffering, past present and future;

b. extreme mental anguish and suffering, past present and future;

c. permanent physical impairment;

d. loss of wages and benefits;

e. loss of future earning capacity and benefits;

f. loss of capacity to enjoy life;

g. medical expenses past and future;

h. annoyance and inconvenience; and

I. permanent scarring and disfigurement.

g. punitive damages as to defendant Arch.

## COUNT I
## DELIBERATE INTENT
### (ICG Beckley)

24. The plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 23 of this Complaint as if set forth herein verbatim.

25. On or about April 21, 2017, defendant ICG Beckley violated W. Va. Code Ann. § 23-4-2(d)(2)(B)in that:

(i) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(ii) That the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;

(iii) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited

12

or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer which rules, regulations and standards were specifically applicable to the work and working condition involved, and were intended to address the specific hazard(s) presented by the alleged specific unsafe working condition[1];

(iv)  That notwithstanding the existence of the facts set forth in subparagraphs (i) through (iii), inclusive, of this paragraph, the person or persons alleged to have actual knowledge under subparagraph (ii) nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

(v)  That Jonathan Barber suffered a serious compensable injury as defined in section one, article four, chapter twenty-three as a direct and proximate result of the specific unsafe working condition.

26.  As a direct and proximate result of defendant ICG Beckley's actions, omissions, and conduct on or about April 21, 2017, Plaintiff Jonathan Barber was rendered an ASIA A complete C6 quadriplegic and will forever be confined to a wheelchair, paralyzed from the chest down.

## COUNT II
## NEGLIGENCE
### (Arch)

27.  The plaintiffs repeat and incorporate here by reference the allegations contained in paragraphs 1 through 26 of this Complaint as if set forth herein verbatim.

28.  As referenced herein above, defendant Arch assumed a duty and undertook to provide safety and compliance oversight and control, among other support services, to subsidiary mine operations, including defendant ICG Beckley's Beckley Pocahontas mine in which Plaintiff

---

[1] As it pertains to the alleged violations upon which plaintiff avers will prove element (c) of his claim, please see the verified statement of Don Ellis, retired MSHA expert with over 40 years of knowledge and expertise of the workplace safety statutes, rules, regulations and consensus industry safety standards specifically applicable to the underground mining industry, attached hereto as Exhibit B. Mr. Ellis' statement contains and describes (1) his knowledge and expertise of the applicable workplace safety statutes, rules, regulations and/or written consensus industry safety standards; (2) The specific unsafe working condition(s) that were the cause of the injury that is the basis of the complaint; and (3) The specific statutes, rules, regulations or written consensus industry safety standards violated by ICG Beckley that are directly related to the specific unsafe working conditions.

Jonathan Barber was employed. Therefore, defendant Arch owed a duty to provide coal miners, including Plaintiff Jonathan Barber, with safe working conditions, including safe work procedures and standards developed and enforced by Arch, as well as the degree of control over safety and regulatory compliance assumed and asserted by Arch at this and other mine sites in the State of West Virginia.

29. Through their involvement and assumption of duties with regard to safety and compliance oversight and control for subsidiaries and the mines they operated, defendant Arch had a duty to ensure that coal was mined in compliance with federal and state mining laws and regulations, as was as commonly accepted safety practices and equipment utilized in the mining industry.

30. Defendant Arch negligently, recklessly, willfully, and with wanton disregard of worker safety breached its duties owed to plaintiff Jonathan Barber, as a miner employed with defendant ICG Beckley and assigned to ICG Beckley's Beckley Pocahontas mine.

31. The acts and omissions forming the basis of Count II of this Complaint were of such extreme, willful, wanton, and reckless nature, and showed such gross indifference to human life as to warrant punitive damages. The acts of defendant Arch were carried out with a flagrant disregard for the rights of others and with actual awareness that their acts would, in reasonable probability, result in human death or great bodily harm.

32. In light of the existence of the unsafe and unstable ribs at the mine on the No. 3 section, of which defendant Arch was aware, the actions of defendant Arch in failing to take action to implement appropriate safeguards and in electing to allow dual seam mining to commence in the absence of such safeguards were with such unwarrantable failure as to demonstrate reckless disregard, intentional misconduct, indifference and/or a serious lack of

reasonable care. Accordingly, defendant Arch engaged in acts or omissions which, when viewed objectively at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential serious harm to others, by and through its control, oversight and involvement in the development, planning and oversight of the mine and mining plan and other facts of the management of underground operations at the mine.

33. Defendant Arch had actual, subjective awareness of the risk involved in their acts and omissions, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. By having knowledge of the unstable, unsafe nature of the mine ribs due to the prevailing geologic conditions at the mine, defendant Arch not only breached its duties of safety management, compliance and oversight, but thereby knowingly and with complete and callous disregard thereby exposed workers to a known, yet preventable, risk of serious injury or death.

34. As a direct and proximate result of defendant's acts, omission and other conduct referenced herein above, on or about April 21, 2017, plaintiff Jonathan Barber sustained the serious, permanently disabling injuries and damages described herein.

35. Punitive damages are justified to punish defendant Arch for their knowing deliberate and wanton acts which resulted in Jonathan Barber's serious, permanently disabling injuries. Defendant Arch knowingly put miners including plaintiff Jonathan Barber in danger. Punitive damages will serve to deter defendants Arch from continuing to defy mining laws and consensus industry safety standards in their pursuit of profits, and placing financial considerations ahead of basic minimal regard for human life, safety, and dignity.

### COUNT III
### LOSS OF CONSORTIUM

36. The plaintiffs repeat and incorporate by reference, the allegations contained in paragraphs 1 through 35 of this Complaint as if set forth herein verbatim.

37. As a further direct and proximate result of the conduct and actions of the defendants as described herein, the plaintiff, Bethany Barber, has been deprived of the loss of society, companionship, and consortium of her husband, Jonathan Barber.

38. Due to being forced to live in Atlanta to be with her husband during his long-term care, plaintiff Bethany Barber lost her employment due to the extended period of absence required to be by her husband's side as he underwent rehabilitation and therapy some 10 hours from home.

39. Now, in addition to being required to care for their son on her own, plaintiff Bethany Barber is also responsible for providing 24 hour care for her husband despite numerous requests for nursing care, thereby eroding the intimate husband and wife bond that they once shared, making her now in essence his nurse and caregiver.

## COUNT IV
## LOSS OF PARENTAL CONSORTIUM

40. The plaintiffs repeats and incorporate by reference, the allegations contained in paragraphs 1 through 39 of this Complaint as if set forth herein verbatim.

41. As a further direct and proximate result of the conduct and actions of the Defendants as described herein, L.B., who was born on June 20, 2016, has been deprived of the loss of society, companionship and consortium of his father, Jonathan Barber.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for:

    a.) compensatory damages to be determined by a jury according to the laws of the State of West Virginia;

    b.) punitive damages to be determined by a jury according to the laws of the State of West Virginia as it relates to defendant Arch;

    c.) costs and attorney fees expended in prosecution of this matter;

d.) pre-judgment and post-judgment interest as provided under the law; and

e.) any and all other relief to which the Court deems plaintiffs are entitled.

**A JURY TRIAL IS DEMANDED.**

JONATHAN BARBER, and his wife, BETHANY BARBER, individually, and as parents, guardians <u>and next friends of their minor son, L.B.,</u>
By Counsel,

*[signature]*

D. Blake Carter, Jr. (WV State Bar No. 9970)
BAILEY JAVINS & CARTER, LC
213 Hale St.
Charleston, WV 25301
304-345-0346
*Counsel for Plaintiff*